IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

Case No.: 3:20-cv-00571-GCM

| NAUTILUS INSURANCE COMPANY, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | ORDER |
| PHILIPS MEDICAL SYSTEMS NEDERLAND B.V.; PHILIPS NORTH AMERICA LLC; PHILIPS INDIA LTD.; TEC HOLDINGS, INC. F/K/A TRANSTATE EQUIPMENT COMPANY, INC. F/K/A TRANSTATE HOLDINGS, INC., AND ROBERT A. ("ANDY") WHEELER, INDIVIDUALLY, AND IN HIS CAPACITY AS EXECUTOR AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DANIEL WHEELER | ) | |
| Defendants. | ) | |

This matter is before the Court upon Plaintiff Nautilus Insurance Company's (Nautilus) Motion for Summary Judgment (Doc. No. 22) and Defendants TEC Holdings, Inc. and Andy Wheeler's Motion for Summary Judgment on Duty to Defend (Doc. No. 20). Both summary judgment motions have been fully briefed and are ripe for disposition.

I.     FACTUAL BACKGROUND

Nautilus filed this declaratory judgment action seeking a determination of the Parties' rights and obligations under two commercial general liability policies (the "Policies") Nautilus issued to "Transtate Equipment Company, Inc.," now known as TEC Holdings, Inc. ("TEC"). TEC has been sued in an underlying lawsuit filed by various Philips entities (collectively, "Philips") against TEC and Robert A. ("Andy") Wheeler, individually and in his capacity as

1

executor and personal representative of the Estate of Daniel Wheeler, captioned *Philips Medical Systems Nederland B.V.; Philips North America LLC, and Philips India Ltd., v. TEC Holdings, Inc., F/K/A Transtate Equipment Company, Inc., Transtate Equipment Company, Inc., F/K/A Transtate Holdings, Inc.; and Robert A. ("Andy") Wheeler, Individually and in his capacity as executor and personal representative of the Estate of Daniel Wheeler* (the "Underlying Lawsuit"). The Underlying Lawsuit is currently pending in the United States District Court for the Western District of North Carolina, 3:20-cv-21-MOC-DCK. The Parties herein disagree as to whether coverage is available for the Underlying Lawsuit under the Policies. If the Policies do not provide coverage for the allegations in the operative complaint filed in the Underlying Lawsuit, Nautilus does not have a duty to defend or indemnify any insureds or purported insureds in the Underlying Lawsuit.

Coverage A[1] of the Policies at issue provides in pertinent part that Nautilus "will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' . . . caused by an 'occurrence.'" (Doc. No. 1, Ex. A at Form CG 00 12 04; Ex. B at Form CG 00 12 04). "Property Damage" is defined in the Policies as follows:

> a. Physical injury to **tangible property**, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
>
> For the purpose of this insurance, **electronic data is not tangible property**.
>
> As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells,

---

[1] The Defendants have conceded that no coverage exits under Coverage B-Personal and Advertising Injury Liability.

2

> data processing devices or any other media which are used with electronically controlled equipment.

(*Id*.) (emphasis added). The Policies define an "occurrence" as an "accident." (*Id*.)

Coverage under Coverage A of the Policies is also subject to various exclusions, including the Expected or Intended Injury Exclusion. The Expected or Intended Injury Exclusion precludes coverage for "'property damage' expected or intended from the standpoint of the insured." (*Id*.)

The Second Amended Complaint (the "Underlying Complaint"), the operative complaint in the Underlying Lawsuit, asserts multiple claims against various parties, including TEC Holdings, Inc. f/k/a Transtate Equipment Company, Inc. ("Transtate I"), Transtate Equipment Company, Inc., f/k/a Transtate Holdings, Inc. ("Transtate II"),[2] and Robert A. Wheeler, individually and in his capacity as executor and personal representative of the Estate of Daniel Wheeler (collectively, "Defendants"). According to the Underlying Complaint, Philips "develops, sells, supports, maintains, and services medical imaging systems, such as X-ray systems, used at hospitals and medical centers, including the proprietary hardware and software used to operate, service, and repair such systems." (Doc. No.1, Ex. C at ¶ 1.) Philips alleges that its medical systems include its "copyrighted and propriety intellectual property, and proprietary trade secrets, in the form of, among other things, proprietary software that Philips technicians can use to service the medical imaging systems. Philips includes proprietary access controls on the medical imaging systems to restrict access to its proprietary software to authorized individuals." (*Id.* at ¶ 3.) As for Transtate I and Transtate II, Philips alleges that "Transtate I provided and Transtate II provides maintenance and support services for certain of [Philips']

---

[2] The Defendants have conceded that no coverage exists for Transstate Equipment Company, Inc., f/k/a/ Transtate Holdings, Inc. ("Transtate II") under the Policies and a Stipulation to that effect has been filed (Doc. No. 23).

medical systems" and that "[s]everal prior employees of Philips North America LLC were previously employed by Transtate I and are currently employed by Transtate II as service specialists, service technicians, or similar positions." (*Id.* at ¶ 2.) Philips further alleges that:

> Transtate I has used, and Transtate II continues to use, misappropriated trade secret information to circumvent the access controls on Philips' medical imaging systems to gain unauthorized access to proprietary and copyrighted software [in addition to having] made unauthorized copies of Philips' standalone service software, circumvented access controls on the standalone software, and made unauthorized use of such software. Transtate I and II have also decrypted and made unauthorized copies of Philips' copyrighted service documentation. Transtate uses its unauthorized access to and copies of Philips' proprietary software and copyrighted documents to unfairly compete against Philips.

(*Id.* at ¶ 4.)

Philips alleges that Daniel Wheeler "was the President of Transtate I until near the time of his passing [in March 2019] and was the President of Transtate II until sometime in 2018." (*Id.* at ¶ 15.) According to the Underlying Complaint, in his capacity as president of both Transtate entities, "Daniel Wheeler oversaw Transtate's actions addressed in [that] complaint, including its use of an exploit method [used] to gain unauthorized access to Philips Proprietary Service Materials." (*Id.*) As for Robert Wheeler, Philips alleges that he "is the Vice-President of Transtate I and took over as the President of Transtate II from Daniel Wheeler sometime in 2018" and, in these capacities, he "oversaw Transtate's actions addressed in this complaint." (*Id.* at ¶¶ 17-18.)

As for Defendants' specific actions giving rise to the claims asserted in the Underlying Complaint, Philips generally alleges that Transtate I offered and Transtate II currently offers post-warranty maintenance and servicing for certain Philips systems, "at least in part, by hiring or employing former Philips employees and by improperly and knowingly using Philips' confidential and proprietary information that those employees learned during the course of their

4

employment with Philips and which was provided to those employees on a confidential basis and as a condition of their employment." (*Id*. at ¶¶ 49-51.) Specifically, Philips alleges that "Transtate has developed multiple mechanisms (the "Exploit Mechanisms") for exploiting Philips' proprietary service tools, Philips' Proprietary Service Materials, Philips' Field Service Framework, and Philips' copyrighted documents, software, and log files," including exploit software that "modifies files within Philips Systems thereby circumventing access controls, effectively disabling such access controls, and allowing Transtate employees and others to gain access to Philips' trade secrets and copyrighted materials." (*Id*. at ¶¶ 48-49.) According to the Underlying Complaint, Transtate "instructs [its] employees . . . to make use of the software exploit" and "has also distributed, . . . and . . . continues to distribute, its software exploit to other third parties, and has trained such third parties in use of the software exploit." (*Id.* at ¶¶ 62-63.) Furthermore, Philips alleges that "[Robert] Wheeler developed, and Daniel Wheeler encouraged [Robert] Wheeler's development of, the software exploit," which allegedly required Robert Wheeler to make "unauthorized use of Philips' trade secrets obtained from Former Philips Employees." (*Id.* at ¶ 65.)

Philips asserts claims in the Underlying Lawsuit for violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; the Digital Millennium Copyright Act, 17 U.S.C. § 1201; the Defend Trade Secrets Act, 18 U.S.C. § 1836; misappropriation of trade secrets and violations of the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760, *et seq*.; and copyright infringement, 17 U.S.C. § 101, *et seq*.

Nautilus seeks a judgment declaring that the allegations of the Underlying Lawsuit are excluded from coverage under Coverage A of the Policies, and, therefore, Nautilus has no duty to defend or indemnify any Defendants. Defendants, conversely, seek a judgment declaring that

5

Nautilus has a duty to defend the Defendants (or some of them) in the Underlying Lawsuit under Coverage A of the Policies.

## II. DISCUSSION

### A. Summary Judgment Standard

Under North Carolina law, the interpretation of the terms of an insurance policy is a question of law. *See ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co.*, 472 F.3d 99, 115 (4th Cir. 2006). As such, "[t]he construction and application of insurance policy provisions to undisputed facts is . . . properly committed to the province of the trial judge for a summary judgment determination." *Breezewood of Wilmington Condominiums Homeowners' Ass'n, Inc. v. Amerisure Mut. Ins. Co.*, Case No. 7:07-CV-50-D, 2008 WL 859018, at *3 (E.D.N.C. Mar. 31, 2008) (Dever, J.) (quoting *Sitzman v. Gov't Emps. Ins. Co.*, 641 S.E.2d 838, 840 (N.C. Ct. App. 2007) (internal quotation omitted)), *aff'd*, 335 F. App'x 268 (4th Cir. 2009).

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B. North Carolina Standard for Interpretation of Insurance Policies

When analyzing insurance contracts, "the intention of the parties controls any interpretation or construction of the [insurance] contract, and intention must be derived from the language employed." *Greenwich Ins. Co. v. Med. Mut. Ins. Co. of N.C.*, 88 F. Supp. 3d 512, 515-16

(E.D.N.C. 2015), *aff'd*, 667 F. App'x 385 (4th Cir. 2016). A provision in an insurance policy will be deemed ambiguous only if it is "fairly and reasonably susceptible to [different] constructions for which the parties contend." *Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 172 S.E.2d 518, 522 (N.C. 1970). However, "a term or provision is not ambiguous simply because one party argues there is some possible alternative meaning." *Stewart Eng'g, Inc. v. Cont'l Cas. Co.*, No. 5:15-CV-377-D, 2018 WL 1403612, at *5 (E.D.N.C. Mar. 20, 2018). "[I]f the meaning of the policy is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein." *Woods v. Nationwide Mut. Ins. Co*., 246 S.E.2d 773, 777 (N.C. 1978). "Each word is deemed to have been put into the policy for a purpose and will be given effect, if that can be done by any reasonable construction." *Hancock v. Americo Fin. Life & Annuity Ins. Co*., 272 F. Supp. 3d 763, 773 (E.D.N.C. 2017) (citation omitted), *appeal dismissed and remanded*, 723 F. App'x 241 (4th Cir. 2018).

### C. Insurer's Duty to Defend

Under North Carolina law, a liability insurer's obligation to defend its insured in a third-party action "is ordinarily measured by the facts as alleged in the pleadings. . . . When the pleadings state facts demonstrating that the alleged injury is covered by the policy, then the insurer has a duty to defend, whether or not the insured is ultimately liable." *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 340 S.E.2d 374, 377 (N.C. 1986). However, "when the pleadings allege facts indicating that the event in question is not covered, and the insurer has no further knowledge that the facts are otherwise, then it is not bound to defend." *Id*. Further, North Carolina courts apply the "comparison test," which entails "reading the policies and the

complaint side-by-side to determine whether the events as alleged are covered or excluded." *Id*. at 378. "Any doubt as to coverage is to be resolved in favor of the insured." *Id*. Ultimately, "if the facts are not even arguably covered by the policy, then the insurer has no duty to defend." *Id.*

### D. Allegations in the Underlying Complaint

As noted above, the Policies only cover "physical injury to tangible property," and explicitly state that "electronic data is not tangible property." (Doc. No. 1, Ex. A at Form CG 00 12 04; Ex. B at Form CG 00 12 04.) Electronic data is defined to include computer software. (*Id.*)

In the Underlying Complaint, Philips generally alleges that Defendants' actions damaged Philips' proprietary software, causing Philips to sustain business losses. Pursuant to the plain language of the Policies, any alleged damage to the proprietary software installed on pieces of machinery does not constitute "property damage." *See America Online, Inc. v. St. Paul Mercury Ins. Co.*, 347 F.3d 89 (4th Cir. 2003) (holding that insurers did not have duty to defend under CGL policy covering claims for "property damage" (defined as physical damage to or loss of use of "tangible property") in a suit alleging that provider's proprietary software package caused physical damage to and loss of use of computer data, software and systems on the basis that the software and systems did not qualify as "tangible property"); *see also Robert Bowden, Inc. v. Aetna Cas. & Sur. Co*., 977 F. Supp. 1475 (N.D. Ga. 1997) (holding that underlying lawsuit alleging that insured committed copyright infringement via unauthorized duplication of software onto hard disks of its personal computers concerned damage to intangible property only, and thus did not allege "property damage" within meaning of insured's liability policies, whose definitions of that term limited the definition of property damage to "tangible property," and

8

noting that the policies specifically mentioned copyright infringement in connection with "advertising injury" coverage).

Defendants rely solely on paragraphs 147 and 157 of the Underlying Complaint in support of their argument that the Complaint alleges physical injury to tangible property. These paragraphs allege that Defendants have "damaged the Systems and Phillips' proprietary software on the systems." (Doc. No.1, Ex. C at ¶¶ 147, 157). Defendants contend that these two paragraphs out of the 392 paragraphs of the Underlying Complaint are sufficient to allege "property damage" because damage to the Systems, i.e., the machines, is damage to tangible property. However, nowhere in the 392 paragraphs of the Underlying Complaint does Phillips allege damage to the Systems' hardware (the monitor, keyboard, mouse, wiring, etc.), that is, the tangible property elements of the machines. The entirety of the Underlying Complaint contains only allegations of damage to the intangible elements of the Systems – the software, not the hardware. In fact, the paragraphs preceding paragraphs 147 and 157 provide context to demonstrate that Philips is indeed alleging damage solely to intangible property. The preceding paragraphs, paragraphs 146 and 156, allege that Defendants have "impaired the integrity of the Philips' proprietary software on the Systems and the integrity of the Systems generally by modifying software . . . ." (*Id*. at ¶¶ 146, 156). Thus, it is clear when reading the Underlying Complaint in its entirety that the only manner in which Philips alleges that the "Systems" were damaged was by the alleged damage to the proprietary software on the Systems rather than damage to the Systems' hardware.

In addition, paragraphs 147 and 157 are contained in Philips' count for Violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a) (Transtate I and II). A cause of action under the CFAA is not a cause of action that provides for money damages for damage to

tangible property, but it instead allows for fine(s) or imprisonment where the perpetrator intentionally accesses a computer without authorization or in excess of authorization. *See* 18 U.S.C. § 1030(a).

The Court has carefully read all 91 pages of the Underlying Complaint. Comparing the allegations of the Underlying Complaint against the language of the Policies, the Court finds that the Underlying Complaint does not contain allegations of "property damage" as defined in the Policies.

Even if the Underlying Complaint did contain allegations of "property damage," the Policies only provide coverage for property damage cause by an "occurrence," which the Policies define as an "accident." (*See* Doc. No. 1, Ex. A at Form CG 00 12 04; Ex. B at Form CG 00 12 04). North Carolina courts define an "accident" as an "unforeseen event, occurring without the will or design of the person whose mere act causes it; an unexpected, unusual or undersigned occurrence, the effect of an unknown cause, or, the cause being known, an unexpected consequence of it; a casualty." *Waste Management of Carolinas*, 340 S.E.2d at 379. Thus, when considering whether the alleged damages were caused by an "occurrence," North Carolina courts consider whether the incident and/or injury was a reasonably foreseeable result of the insured's action.

It is abundantly clear that the Underlying Complaint does not allege that any damages were the result of an accident, but rather only contains allegations of intentional acts and expected or intended consequences. Philips alleges in support of each of the counts that Defendants acted intentionally, knowingly, and/or with the intent to defraud. (Doc. No.1, Ex. C at ¶¶ 144, 149, 150, 154, 159, 160, 174, 181, 190, 199, 204, 205, 219, 220, 221, 261, 275, 287, 297, 298, 304, 314, 331, 347, 363, 364, 377, 387). Courts throughout various jurisdictions

have held that many of the claims asserted in the Underlying Complaint would not support allegations of an "occurrence" by their very nature. *See*, e.g., *In re Russel*, 285 B.R. 877, 885 (M.D.N.C. 2001), *aff'd*, 36 F. App'x 115 (4th Cir. 2002) ("In the present case, the complaints include claims for fraud, conversion, and unfair and deceptive trade practices. These claims obviously would not be covered as an 'occurrence' because they involve allegations that plaintiffs intentionally acted wrongfully."); *Lemko Corp. v. Fed. Ins. Co.*, 70 F. Supp. 3d 905, 915-16 (N.D. Ill. 2014) (holding that insurers had no duty to defend against claims for violation of the Computer Fraud and Abuse Act, misappropriation of trade secrets, breach of fiduciary duty, usurpation of corporate opportunity, breach of contract, tortious interference with contract, copyright infringement, and civil conspiracy, in part, because the consequences of such acts did not constitute an "accident" under an insurance policy); *Pica Corp. v. Clarendon America Ins. Co.,* 339 Fed. Appx. 540 (6th Cir. 2009) (holding that claims against insured for interference with a prospective economic advantage and misappropriation of trade secrets did not result from an "occurrence" covered under CGL policies); *Wilson Works, Inc. v. Great American Ins. Group*, 495 Fed. Appx. 378 (4th Cir. 2012) (holding that an insured's alleged tortious interference with a competitor's business relations and conspiracy to interfere with its business relations did not constitute an "occurrence" within the meaning of the CGL policies); *Auto-Owners Ins. Co. v. McMillan-Trucking Inc.*, 242 F. Supp. 3d 1259 (N.D. Ala. 2017) (holding that civil conspiracy claims asserted in a complaint were not caused by an "occurrence").

As the Underlying Complaint only contains allegations of damages arising from the Defendants' knowing, intentional, and/or deliberate actions, it does not contain allegations of an "occurrence," as the term is defined by the Policies and interpreted under North Carolina law.

Nautilus also argues that the Policies' Expected or Intended Injury Exclusion precludes coverage for any "property damage" that is expected or intended from the standpoint of the insured. (*See* Doc. No. 1, Ex. A. at Form CG 00 01 12 04; Doc. No.1, Ex. B. at Form CG 00 01 12 04.) Under North Carolina law, for the Expected or Intended Injury Exclusion to apply, "both the act and the resultant harm must have been intended." *See*, *e.g.*, *Nationwide Mut. Ins. Co. v. Grady*, 502 S.E.2d 648, 651 (N.C. Ct. App. 1997). North Carolina courts apply an objective standard to determine whether the act and the resultant harm were intended from the standpoint of the insured. *See*, *e.g.*, *North Carolina Farm Bureau Mut. Ins. Co. v. Allen*, 553 S.E.2d 420, 424 (N.C. Ct. App. 2001) (holding that similar expected or intended injury exclusions contained language that "suggest[ed] the application of an objective standard as opposed to a subjective one.") (citing *North Carolina Farm Bureau Mut. Ins. Co. v. Mizell*, 530 S.E.2d 93, 95 (N.C. Ct. App. 2000)). Furthermore, "while intent to injure is required, an intent to injure may be inferred where the act is substantially certain to result in injury." *State Auto Ins. Co. v. McClamroch*, 497 S.E.2d 439, 443 (N.C. Ct. App. 1998).

Philips not only alleges in its Underlying Complaint that Defendants acted intentionally, but also alleges that the resultant harm was intended. (*See*, *e.g.*, Doc. No.1, Ex. C at ¶¶ 149 ("Transtate I has thereby knowingly, and with intent to defraud, accessed a protected computer without authorization, and by means of that conduct furthers the intended fraud and obtained value."), 150, 159, 160 ("Transtate II intentionally caused damage without authorization to a protected computer"), 174, 219, 220, 221, 263 ("Transtate I and II have acted intentionally and with malice to injure Philips . . .")). Comparing the allegations of the Underlying Complaint against the language of the Policies, the Expected or Intended Injury Exclusion precludes

coverage for the damages alleged in the Underlying Lawsuit, such that Nautilus has no coverage (including defense) obligations with respect to same.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment is hereby GRANTED; and Nautilus has no duty to defend or indemnify any of the Defendants in the Underlying Lawsuit;

IT IS FURTHER ORDERED that Defendants TEC Holdings and Andy Wheeler's Motion for Summary Judgment on Duty to Defend is hereby DENIED.

Signed: July 12, 2021

Graham C. Mullen
United States District Judge